Estate of India Bailey Kerr, John A. Kerr and Nancy Kerr Johnson, Independent Executors v. Commissioner.
Estate of Kerr v. Commissioner
Docket No. 47803.
United States Tax Court
T.C. Memo 1955-52; 1955 Tax Ct. Memo LEXIS 288; 14 T.C.M. (CCH) 178; T.C.M. (RIA) 55052; March 9, 1955
*288 R. B. Cannon, Esq., 525 Fort Worth National Bank Building, Fort Worth, Tex., for the petitioner. Paul M. Newton, Esq., for the respondent. JOHNSON
Memorandum Findings of Fact and Opinion JOHNSON, Judge: The Commissioner determined a deficiency in the estate tax of petitioner in the sum of $23,447.28. The two issues here presented for our decision are: (1) Was the fair market value of 3,515.56 acres of land in Gonzales County, Texas, belonging to decedent's estate and known as the "Bailey Farm", on October 25, 1949, $45 per acre, as determined by the Commissioner, rather than $20 per acre, as claimed by petitioner? (2) Is the estate of India Bailey Kerr entitled to additional deduction for separate debts owing to decedent at the time of her death, in amounts greater than the deductions therefor allowed by the Commissioner in his notice of deficiency? At the hearing the parties agreed that petitioner's claim for deductions relating to state inheritance tax, attorneys' fees, etc., will be resolved under Rule 50 or Rule 51. Findings of Fact India Bailey Kerr, hereinafter called decedent, died testate on October 25, 1948, at the age of 72 years. Her will named *289 her son, John A. Kerr, and her daughter, Nancy Kerr Johnson, as independent executors, and upon probate of the will they were appointed and duly qualified as such. Thereafter a Federal estate tax return was filed by petitioner with the then collector of internal revenue for the first district of Texas. Petitioner elected, under section 811(j), I.R.C. of 1939, to have decedent's gross estate valued as of one year following the date of her death, viz: October 25, 1949, which is sometimes herein referred to as the basic date. Among other property owned by decedent at her death was a tract of land comprising 3,515.56 acres, located in Gonzales County, Texas, and known as the "Bailey Farm", and hereinafter so designated. This land was included in petitioner's Federal estate tax return at a valuation therein on the basic date of $20 per acre, or a total value of $70,311.20. Respondent in his notice of deficiency determined that the Bailey Farm had a fair market value on October 25, 1949, of $45 per acre, or a total value of $158,200.20. The Bailey Farm had been owned by decedent's family for many yeasr. During her father's lifetime it was owned by him as his separate property, he *290 having inherited it from his father. Upon the death of decedent's father, in 1908, the Bailey Farm, under Texas law, descended to her, his only child, as her separate property, subject to a life estate in one-third thereof which was vested in decedent's mother. In about 1910 decedent conveyed an undivided one-half interest in the Bailey Farm to her mother, Nannie C. Bailey. Decedent's mother died on May 25, 1936, whereupon decedent became the sole and complete owner of the Bailey Farm, and continued so to be until her death. In 1938, in determining the amount of Federal estate tax due by the estate of Nannie C. Bailey, a value of $10 per acre was placed on the Bailey Farm by her estate, which valuation was accepted by the internal revenue bureau, after a representative of the bureau, an estate tax examiner, had made a personal inspection of the farm. In the examiner's report to the bureau, dated March 26, 1938, he described the land as "worn out farm and broken pasture land of poor soil" and "the improvements are of small value." Prior to decedent's death, she also owned, as her separate property, another tract of land of about 900 acres called the Peach Creek Farm, located about *291 2.1 miles by air and approximately 5 miles by road from the Bailey Farm. In 1947 decedent, acting through her husband, John A. Kerr, Sr., listed both farms for sale with one Short, a realtor of Gonzales, Texas, at a price of $55 per acre for the Peach Creek Farm and $50 per acre for the Bailey Farm. After several months had elapsed without the sale of either, despite the advertising of both, Short advised decedent's husband that the price of the Bailey Farm was much too high, whereupon decedent's husband advised Short that if he had an offer of $40 an acre for the Bailey Farm, to submit it for decedent's consideration. Shortly after that, in late 1947 or early 1948, the Peach Creek Farm was sold at $50 an acre, whereupon Short intensified his efforts to find a purchaser for the Bailey Farm and advertised extensively in the Houston, Dallas and other Texas papers, but was never able to secure a purchaser, or one who would even authorize submitting an offer for the purchase of same, and at the time of decedent's death, on October 28, 1948, Short still had the Bailey Farm listed for sale. Decedent's husband died about four months after her death. After 1949, in 1950 and 1951 there was *292 a substantial advance in the market value of farm lands in Gonzales and adjoining counties. The annual gross income of the Bailey Farm during the period from about 1940 to 1948 varied from a high of $7,000 to a low of approximately $1,500, averaging about $4,000 per year. For 1949 and subsequent years, the gross income of the Bailey Farm was as follows: Year
Gross Income
1949
$5,823.01
1950
7,013.58
1951
2,052.16
1952
1,463.12
1953
1,256.91
In 1950 and years immediately preceding, the major portion of the income was $1 per acre from oil lease rentals. In 1950 the oil lease expired and income from that source terminated. The other major source of income was from grazing leases of 75 cents per acre. However, after decedent's death, her executors did not renew these grazing leases as they periodically expired, but instead took over the land for rehabilitation, which included the resting, retirement and deferring of pastures. The Bailey Farm is 12 miles from the nearest town, 6 miles from the nearest village and 6 miles from the nearest paved road. It is divided by a graveled country road running generally north and south, with approximately 1,000 acres *293 west of the road and 2,500 acres east of it. The west 1,000 acres included two fields, one composed of 100 acres which had been abandoned for about 30 years, and one composed of 60 acres which was abandoned after decedent's death. In the east 2,500 acres was a field containing about 300 acres which had been unsuccessfully contoured in the early 1930s, and other fields containing approximately 330 acres of cultivatable land. All of the land, except that actually in cultivation, was under lease for grazing purposes in 1949 and had been for many years at 75 cents per acre annually. According to a survey of the land made by the United States Soil Conservation Service in 1949, 56 acres was classed as good land that could be cultivated safely with easily applied conservation practices, 104 acres was classed as moderately good land that could be used regularly for cultivated crops in a good rotation with intensive conservation treatments, 170 acres was classed as fairly good land which was best suited for pasture but which could be cultivated occasionally if handled with great care, and the remainder was classed as land suitable for grazing if handled with varying degrees of care. The soil *294 and grasses on the land were in poor condition. Both the soil and grass on the Bailey Farm were greatly inferior to that of the Peach Creek Farm. On an acreage basis, the latter would "run"about twice as many cattle per acre as the former. The fair market value of the Bailey Farm on October 25, 1949, the basic date, was $30 per acre, or a total value of $105,466.80. In petitioner's estate tax return, Schedule K, "Debts of Decedent", among the debts there listed are the following: Item No.
Creditor
Amount Paid
4
Notes due Arnim and Lane: $34,414.76 with interest from
8-30-42 at 7%
$ 1,700.00 with interest from
6-27-28 at 7%
Settled for
$15,000.00
6
Notes due Flatonia State
Bank, Flatonia, Texas.
Settled for
1,000.00
8
Note due Mrs. Penn Wood.
Settled for
2,250.00 [1]
9
Note due Mrs. Adele South-
ard, San Antonio, Texas,
dated 1-22-44, $2,000.00
with interest at 5%
Unpaid balance of prin-
cipal
898.05
These debts were all paid out of funds belonging to decedent's estate. They were all incurred and expended *295 for money borrowed and services performed in the management and operation of decedent's two farms, one of 3,500 acres and the other of 900 acres, both being her separate property. Decedent's husband acted as her agent in procuring the loans. Opinion What was the fair market value on October 25, 1949, of the so-called Bailey Farm belonging to decedent's estate? That is issue No. 1. Evidence in detail concerning this farm was had as to its size, location, character and condition of the soil, its productivity, income produced therefrom, etc., all of which is contained in our findings of fact. The farm was an old one and much of the land was worn out, and its productivity was at low ebb. As to its fair market value, we heard the testimony of two expert witnesses, one on behalf of petitioner and one on behalf of respondent. Of the two, greater weight must be given to the testimony of petitioner's witness. He was an active real estate broker living in Gonzales County and knew land values there. He was thoroughly familiar with the Bailey Farm, for at the time of decedent's death he was, and had been for two years, trying to find a purchaser therefor. Respondent's expert witness was *296 a retired land bank appraiser living in San Antonio. He never saw the Bailey Farm but once, and that was just before the trial. He frankly admitted that his inspection was not thorough, for at the time of making same he expected to return later for further inspection, but did not do so. His inspection was more than four years after decedent's death, after land values had increased and decedent's estate had expended about $20,000 in improving the farm. His valuation figure was based largely upon the considerations recited in deeds recorded in the deed records of sales of other tracts in Gonzales County, but all of same, save one, were made subsequent to 1949. After considering all of the evidence and the record as a whole, we have reached the conclusion and find as a fact that the Bailey Farm on October 25, 1949, had a fair market value of $30 per acre, or a total value of $105,466.80. The second issue is what amount of the debts paid by petitioner out of decedent's estate was a liability chargeable against her separate estate, and hence deductible. Petitioner now contends that this amount should be increased by $19,148.05 over that allowed by respondent in the deficiency notice. *297 This sum is the aggregate amount of four debts, being items 4, 6, 8 and 9 in Schedule K of the estate tax return. In the estate tax return these four were listed as community debts, but petitioner now avers that this was erroneously done, due to a misconception of the Texas law. By amended pleading, evidence introduced and on brief, petitioner contends these four were not community debts, but separate debts chargeable against decedent's separate estate and hence deductible. Both parties agree that the recognized and accepted authority in Texas upon the question here presented, and controlling here, is an opinion by the Supreme Court of that State in Gohlman, Lester & Co. v. Whittle, 114 Tex. 548, 273 S.W. 808. It is there held that indebtedness for moneys borrowed by a wife, either directly or through her husband acting as her agent, in order to maintain and grow crops on her separate lands, were separate debts and chargeable against her separate estate. See also Teague v. Burk, 3 S.W. (2d) 461. While conceding the correctness of above holding, respondent says same is not here applicable because petitioner has failed to show (1) that the indebtedness in *298 question was incurred by decedent or by her husband while acting as her agent, and (2) that the indebtedness was "incurred for the purpose of farming and conserving her separately owned lands." The parties most familiar with these matters were decedent and her husband, both of whom are dead. Since the testimony of the principals is not available, the husband's agency for the wife in procuring the loans and the purpose for which obtained must be determined from all the facts and circumstances of the case, and especially the acts and conduct of the parties which reflect their intentions. "The relation of agency does not depend upon an express appointment but it may be and frequently is implied from the acts, words and conduct of the parties and the circumstances of a particular case. It may be implied from a single transaction." Corpus Juris, Vol. 2, p. 435-6. We know that decedent's husband was her agent in trying to sell her farms and in other matters related thereto, and we think the relationship of implied agency as to his acts in obtaining the loans in question clearly appears from all the facts and circumstances here. As to the purpose for which the loans were made, the *299 evidence shows the need and necessity of decedent for such loans. During the creation of all the debts in question, decedent owned and operated two farms, both her separate property, one of 3,500 acres and the other of 900 acres, which required large sums of money to finance and operate, and it was perfectly natural that decedent's husband, acting as her agent, would procure funds for this purpose, and we think from the evidence it is reasonable to so infer. Furthermore, the undisputed evidence shows that proceeds from the loans obtained, equal to, if not in excess of the amounts in question, were expended upon decedent's separate property. As to the second issue petitioner is sustained. Decision will be entered under Rule 50. Footnotes
1. Penn Wood was foreman of decedent's farms and debt was incurred for services rendered by him.↩